# United States Court of Appeals for the Fifth Circuit

———————

No. 24-60095

———————

United States Court of Appeals
Fifth Circuit

**FILED**

July 10, 2025

Lyle W. Cayce
Clerk

Matthew Williams,

*Plaintiff—Appellant*,

*versus*

BP Exploration & Production, Incorporated; BP America Production Company,

*Defendants—Appellees*.

———————————————————

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 1:22-CV-278

———————————————————

Before Elrod, *Chief Judge*, and Higginbotham and Southwick, *Circuit Judges*.

Patrick E. Higginbotham, *Circuit Judge*:

In 2010, the British Petroleum Deepwater Horizon ("DWH") oil spill released crude oil into the Gulf of Mexico. That summer, Plaintiff-Appellant Matthew Williams performed oil spill clean-up work in the Gulf of Mexico. On Sept. 24, 2020, Williams was diagnosed with chronic pansinusitis.

Chronic pansinusitis is "an inflammatory condition involving the para

No. 23-60095

nasal sinuses and linings of the nasal passages that lasts 12 weeks or longer." Its diagnosis rests on the presence of at least two of four symptoms: anterior and/or posterior nasal mucopurulent drainage; nasal obstruction, blockage, or congestion; facial pain, pressure, or fullness; and reduction or loss of sense of smell. It "may present abruptly or begin as acute sinusitis that fails to resolve, or develop slowly over months or years." Some studies conclude that between five and twelve percent of the general population have chronic pansinusitis.

After his diagnosis, Williams brought this lawsuit against Defendants-Appellees BP Exploration & Production Inc. and BP America Production Co. (collectively, "BP") as a back-end litigation option ("BELO") pursuant to a class settlement agreement relating to the DWH oil spill. Williams' lawsuit alleges that he developed chronic pansinusitis from his exposures to oil, dispersants, and other chemicals in oil cleanup work in Florida. Williams offered two expert witnesses to link Williams' chronic pansinusitis to his exposure as a clean-up worker: Dr. Michael Freeman and Dr. James Clark. Each expert authored a report on causation. BP filed motions to exclude the expert reports under Federal Rule of Evidence 702 and *Daubert*,[1] and later filed a motion for summary judgment alleging that Williams had no admissible expert testimony to establish causation and could not succeed on the merits. The district court granted BP's motions and Williams filed this appeal seeking reversal of that order, excluding each expert's testimony and the grant of summary judgment.

## I.

## A.

---

[1] *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

No. 23-60095

This court reviews questions of law, including challenges to summary judgment, *de novo*[2] and decisions regarding the admissibility of expert opinion for abuse of discretion.[3] "A district court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence."[4] "The district court has broad discretion in determining whether to admit expert testimony, and thus on appeal we will sustain the ruling unless it is 'manifestly erroneous,'" meaning the error is "plain and indisputable, and . . . amounts to a complete disregard of the controlling law."[5] "However, when the district court bases its ruling on a question of law, such as an interpretation of the Federal Rules of Civil Procedure or the Federal Rules of Evidence, this court reviews such interpretations *de novo*."[6]

## B.

Federal Rule of Evidence 702 permits opinion testimony from a witness who:

> is qualified as an expert by knowledge, skill, experience, training, or education . . . if the proponent [of the testimony] demonstrates to the court that it is more likely than not that:
>
> > (a) the expert's scientific, technical, or other specialized

---

[2] *United States v. McMaryion*, 64 F.4th 257, 259 (5th Cir. 2023), withdrawn and superseded on other grounds by No. 21-50450, 2023 WL 4118015 (5th Cir. June 22, 2023); *Smith v. Chrysler Grp., L.L.C.*, 909 F.3d 744, 749 (5th Cir. 2018).

[3] *McGill v. BP Expl. & Prod., Inc.*, 830 F. App'x 430, 432 (5th Cir. 2020); *GlobeRanger Corp. v. Software AG United States of Am., Inc.*, 836 F.3d 477, 499 (5th Cir. 2016).

[4] *Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 233 (5th Cir. 2016) (quoting *Nunez v. Allstate Ins. Co.*, 604 F.3d 840, 844 (5th Cir. 2010)).

[5] *McGill*, 830 F. App'x at 432 (quoting *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004)).

[6] *Coleman v. United States*, 912 F.3d 824, 828 (5th Cir. 2019).

No. 23-60095

knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.[7]

Under *Daubert*, courts may consider the following, non-exclusive list of factors to evaluate the reliability of expert testimony:

(1) whether the expert's theory or technique can be or has been tested;

(2) whether the theory or technique has been subjected to peer review and publication;

(3) the known or potential rate of error of the challenged method; and

(4) whether the theory or technique is generally accepted in the relevant scientific community.[8]

The reliability analysis mandated by Rule 702 "applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, *et alia*."[9] The "*Daubert* factors" that the court may use to analyze reliability are not a "definitive checklist or test," and that analysis is flexible.[10] The proponent

_____

[7] Fed. R. Evid. 702.

[8] *Kim v. Am. Honda Motor Co.*, 86 F.4th 150, 160 (5th Cir. 2023) (citing *Daubert*, 509 U.S. at 593-94).

[9] *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007) (citation omitted).

[10] *Kim*, 86 F.4th at 160 (quoting *Daubert*, 509 U.S. at 593-94).

of the expert testimony need not satisfy each *Daubert* factor, but it has the burden of proving that the testimony is reliable.[11]

"Under *Daubert*, Rule 702 charges trial courts to act as gate-keepers, making a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."[12] "[W]hether Daubert's specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine."[13]

## C.

This circuit recently applied the toxic tort standard for causation to a case concerning an illness allegedly caused by the DWH oil spill.[14]

> Our caselaw requires a plaintiff to show both general and specific causation in toxic tort cases. "General causation is whether a substance is capable of causing a particular injury or condition in the general population, while specific causation is whether a substance caused a particular individual's injury." "Evidence concerning specific causation in toxic tort cases is admissible only as a follow-up to admissible general-causation evidence."[15]

---

[11] *United States v. Perry*, 35 F.4th 293, 329 (5th Cir.), cert. denied sub nom. *Peters v. United States*, 143 S. Ct. 462 (2022), and cert. denied, 143 S. Ct. 463 (2022), and cert. denied sub nom. *Owney v. United States*, 143 S. Ct. 602, (2023), and cert. denied sub nom. *Neville v. United States*, 143 S. Ct. 603 (2023).

[12] *Reitz v. Woods*, 85 F.4th 780, 787 (5th Cir. 2023) (quotation marks omitted).

[13] *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153 (1999).

[14] *Prest v. BP Expl. & Prod., Inc.*, No. 22-30779, 2023 WL 6518116, at *2 (5th Cir. Oct. 5, 2023).

[15] *Id.* (citations omitted).

No. 23-60095

"Sequence matters: a plaintiff must establish general causation before moving to specific causation. Without the predicate proof of general causation, the tort claim fails."[16]

## II.

Williams first alleges that the district court failed to apply the "featherweight" causation standard to Williams' burden of proof for general and specific causation—that "[t]he burden on the plaintiff to prove proximate cause in actions based on general maritime law . . . is very light, even 'featherweight'";[17] that by the metric of the featherweight standard, Dr. Freeman's testimony would have been found to be sufficiently helpful and useful to meet the demands of general and specific causation.

Whether a court should apply the featherweight standard is a question of law, and we therefore review it *de novo*.[18] This circuit has applied the featherweight standard, observing that "[t]he reduced burden of establishing proximate cause in Jones Act cases is irrelevant" to a holding that an expert's testimony did not establish general or specific causation.[19] "The standards of reliability and credibility to determine the admissibility of expert testimony under *Daubert* and Rule 702 apply regardless of whether a seaman's burden on proximate causation is reduced."[20] This is not a Jones Act case and we decline to apply the featherweight standard.

---

[16] *Wells v. SmithKline Beecham Corp.*, 601 F.3d 375, 378 (5th Cir. 2010).

[17] *Davis v. Hill Engineering, Inc.*, 549 F.2d 314, 331 (5th Cir. 1977).

[18] *See McMaryion*, 64 F.4th at 259.

[19] *Seaman v. Seacor Marine L.L.C.*, 326 F. App'x 721, 728 n.41 (5th Cir. 2009) (citation omitted).

[20] *Id.*

No. 23-60095

## III.

The district court found Dr. Freeman's general causation opinion to be unreliable and "[o]ut of an abundance of caution" also evaluated Dr. Freeman's specific causation opinion, which it also found to be unreliable. As we find that the district court did not abuse its discretion in finding Dr. Freeman's specific causation opinion to be unreliable, we decline to reach the question of general causation.

Dr. Freeman's specific causation opinion utilized a "differential etiology" approach. The entirety of the section of Dr. Freeman's report titled "Application of differential etiology to the evidence to the cause of Mr. Williams' chronic pansinusitis" reads as follows:

> The differential etiology approach evaluates whether there are alternative plausible causes for a specific plaintiff and to reach a conclusion as to which cause is most likely. There are 6 broad theories on [chronic pansinusitis] etiology and pathogenesis: (1) the "fungal hypothesis," (2) the "superantigen hypothesis," (3) the "biofilm hypothesis," and (4) the "microbiome hypothesis," all of which emphasize key environmental factors, and (5) the "eicosanoid hypothesis" and (6) the "immune barrier hypothesis." Because Mr. Williams did not have any significant medical problems prior to his employment as part of the BPDWH oil spill response, the likelihood of any of these possible competing explanations is exceedingly small.

The district court found Dr. Freeman's specific causation opinion to be unreliable in part because Dr. Freeman "did not describe any attempts to evaluate whether any of the potential alternate causes he lists could have caused Williams' pansinusitis, and there is no discussion of Williams' subsequent work experience or home environment in Dr. Freeman's report."

7

No. 23-60095

Williams responds to the district court's finding, arguing that "Dr. Freeman is not required to exhaustively include every possible detail of his review in a written report." Williams also argues that Dr. Freeman did address potential alternative causes when he stated that "Mr. Williams did not have any significant medical problems prior to his employment as part of the BP DWH oil spill response, the likelihood of any of these possible competing explanations is exceedingly small."

While Dr. Freeman purportedly used a differential etiology approach to evaluate plausible causes for Williams' condition, Dr. Freeman's report never evaluated the plausible causes that he himself identified: (1) the "fungal hypothesis," (2) the "superantigen hypothesis," (3) the "biofilm hypothesis," and (4) the "microbiome hypothesis"—each of which emphasize key environmental factors—(5) the "eicosanoid hypothesis," and (6) the "immune barrier hypothesis." The differential etiology approach requires "determining the possible causes for the patient's symptoms and then eliminating each of these possible causes until reaching one that cannot be ruled out or determining which of those that cannot be excluded is the most likely."[21] But Dr. Freeman's report did not do so. After three sentences, and with zero analysis, the report concluded that Williams' chronic pansinusitis must be due to his oil spill cleanup work.

The district court "has broad discretion in determining whether to admit expert testimony."[22] We find that the district court did not abuse its discretion by a "plain and indisputable" error that "amounts to a complete

---

[21] *Johnson v. Arkema, Inc.*, 685 F.3d 452, 468 (5th Cir. 2012) (quoting *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 262 (4th Cir. 1999)).

[22] *McGill*, 830 F. App'x at 432 (quoting *Guy*, 394 F.3d at 325).

8

No. 23-60095

disregard of the controlling law"[23] when it excluded Dr. Freeman's testimony after finding that Dr. Freeman did not reliably apply the differential etiology approach and cannot meet Rule 702(d)'s requirement for expert witnesses.[24]

## IV.

Williams also challenges the district court's grant of BP's motion to exclude the report of expert witness Dr. Clark. As with Dr. Freeman's report, we are not persuaded that the district court abused its discretion in finding Dr. Clark's specific causation opinion to be unreliable and need not review his general causation opinion.

The district court noted that Dr. Clark's report is facially suspect because it appears to have been prepared for a different case. Dr. Clark's report refers to "Mr. Vincent" instead of "Mr. Williams" six times. These errors call into question how carefully Dr. Clark prepared and reviewed his report, and whether other information—in addition to the plaintiff's name— is likewise inaccurate. As stated by the district court:

> Dr. Clark's research may be applicable to multiple cases, but the references to Vincent cause some doubt as to whether 'cut and paste' findings in his report are correct since Vincent's exposure levels and work experience may have been different from that of Williams.

The district court also found Dr. Clark's report to be more substantively unreliable. First, Dr. Clark agreed that—based on Environmental Protection Agency ("EPA") recommendations for

---

[23] *Id.* (quoting *Guy*, 394 F.3d at 325).

[24] Fed. R. Evid. 702(d) (requiring that the proponent of expert testimony demonstrate that it is more likely than not that the "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case").

conducting an exposure assessment that were used by Dr. Clark to develop his exposure assessment—Williams' total non-cancer risk (including pansinusitis) was "100 times lower than what the EPA deems acceptable for non-cancer risk." When asked how a risk 100 times lower than what the EPA deems acceptable is a "substantial contributor" to Williams' development of chronic pansinusitis, Dr. Clark responded: "That's my opinion that, given the totality of his exposure and his response." Clark also cited his thirty years of experience and a study by Rusiecki J, et al. in response.

The district court found Dr. Clark's report to be unreliable because, as admitted by Dr. Clark, the report overestimated Williams' non-cancer risk from exposure due to his oil cleanup work. Dr. Clark was notified that his analysis assumed that concentrations of the chemical "benzene" were twice as high as they actually were according to Environmental Protection Agency data. Dr. Clark's report—seemingly inadvertently—assumes that benzene concentrations were two times higher than that data actually indicates, and Dr. Clark admitted that this was a mistake in a deposition. For these reasons, the district court found Dr. Clark's specific causation opinion to be unreliable and inadmissible.

Williams argues that the court erred when considering Dr. Clark's specific causation opinion for two reasons: first, because "Dr. Clark did explain his basis for his opinion" by stating at a deposition that "just because [Williams' exposure is] below the threshold doesn't mean . . . that adverse effects cannot happen."; and second, because "the District Court failed to consider Dr. Clark's explanation for why he stands behind his opinions."

Williams' arguments fail to rebut the district court's findings that Dr. Clark's study is unreliable because it appears to have been prepared at least in part for another case or that it is unreliable because it assumed benzene concentrations to be two times greater than they actually were. These

mistakes call into question whether Dr. Clark's specific causation opinion is reliably "based on sufficient facts or data" under Rule 702(b). Williams does not rebut either of these justifications for finding Dr. Clark's specific causation opinion to be unreliable, or otherwise show that the district court's finding was an abuse of discretion.

Williams also did not adequately rebut the district court's conclusion that Dr. Clark's report is unreliable as the report simultaneously found: (1) that Williams' total non-cancer risk (including pansinusitis) was 100 times lower than what the EPA deems acceptable for non-cancer risk; and (2) that Williams' exposure must have caused his chronic pansinusitis. While not cited by the district court, Dr. Clark himself agreed in a deposition that even if Williams' exposures were 100 times higher than Dr. Clark estimated, those exposures "still were not likely to cause any adverse health effects, including but not limited to sinusitis, under the language cited in [Dr. Clark's] report."

The district court's exclusion of Dr. Clark's specific causation opinion is not a plain and indisputable error constituting a complete disregard of controlling law.[25] We decline to find that the district court abused its discretion.

## IV.

Having excluded Dr. Freeman's and Dr. Clark's expert witness reports, the district court found that Williams was unable to demonstrate general or specific causation and granted BP's motion for summary judgment.

The section of Williams' appellate brief arguing that the district court erred in granting summary judgment reads in its entirety:

---

[25] *McGill*, 830 F. App'x at 432 (quoting *Guy*, 394 F.3d at 325).

The district court granted BP's motion for summary judgment solely because it had excluded all of Mr. Williams' causation experts. Because the district erred in excluding Dr. Freeman's and Dr. Clark's causation opinions regarding chronic sinusitis, it also erred in granting summary judgment.

Williams separately argues in another section of his appellate brief that the district court granted summary judgment "on an inaccurate record." Williams argues that BP "misrepresented Appellant's burden as it relates to the legal sufficiency and relevance of studies." However, Williams does not allege that the district court relied on this purported misrepresentation and even notes that BP's quote purportedly misstating Williams' burden is "absent from the written opinion."

We cannot determine that the district court relied on BP's supposed misrepresentations as the district court's order granting summary judgment does not discuss those portions of BP's argument that Williams alleges to be misrepresentations. Regardless, this court need not rely on BP's arguments in its *de novo* review of the district court's order granting summary judgment. "Summary judgment is appropriate if the movant demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."[26] "Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment."[27] Here, there is no genuine issue of material fact as to specific causation as Williams cannot prove specific causation without the excluded experts' reports. Because Williams cannot prove specific causation

---

[26] *McGill*, 830 F. App'x at 432 (citing Fed. R. Civ. P. 56(a)).

[27] *Id.* (quoting *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003)).

No. 23-60095

in this toxic tort case, we must uphold the district court's grant of summary judgment.[28]

## V.

Accordingly, the district court's orders granting BP's motions to exclude the expert reports of Dr. Freeman and Dr. Clark and granting BP's motion for summary are **AFFIRMED**.

---

[28] *See Seaman*, 326 F. App'x at 729.